```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOHN DOE,
                              Plaintiff,              COMPLAINT
        -against-
                                                      JURY TRIAL DEMANDED
AL JAZEERA MEDIA NETWORK ("AJMN"),
AL JAZEERA AMERICA ("AJAM") AND
INFINITY CONSULTING SOLUTIONS ("ICS"),
                              Defendants.
------------------------------------------------------------------X
```

Plaintiff, by his attorneys, The Aboushi Law Firm, PLLC., complaining of the Defendants, alleges:

## NATURE OF THE ACTION

1. Plaintiff brings the instant action based for breach of contract, wrongful termination, tortious interference with contract, prima facie tort, promissory estoppel, intentional infliction of emotional distress and negligent infliction of emotional distress.

## THE PARTIES

2. At all times hereinafter-mentioned Plaintiff, John Doe, is a resident of the State of California.

3. At all times hereinafter-mentioned Plaintiff, was an employee of AL JAZEERA AMERICA ("AJAM") and AL JAZEERA MEDIA NETWORK (AJMN).

4. At all time hereinafter-mentioned Plaintiff was hired through INFINITY CONSULTING SOLUTIONS, INC. ("ICS").

5. Upon Information and Belief, AJMN is foreign corporation authorized to do business in New York with a principle place of business in Qatar.

6. Upon Information and Belief, AJAM is a subsidiary of AJMN.

1

7. Upon information and belief AJAM is a domestic corporation with a principle place of business at 435 Hudson Street New York, NY 10014.

8. Upon Information and Belief, AJAM and AJMN are media corporations.

9. Upon Information and Belief, ICS is a foreign corporation authorized to do business in New York.

10. Upon Information and Belief, ICS is a domestic corporation with a principle place of business in New York, New York.

## JURISDICTION AND VENUE

11. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

12. Venue is proper under 28 U.S.C. § 1391(a)(1) because the Defendants ICS and AJAM have principle places of business within this judicial district.

13. The amount in controversy exceeds $75,000.

14. Defendant is subject to the exercise of personal jurisdiction by this Court.

15. There exists now between the parties an actual, justiciable controversy in which Plaintiff is entitled to relief because of the facts and circumstances set forth below.

## STATEMENT OF FACTS

16. For two years Respondents altered the terms of John Doe's work agreement including misleading Plaintiff as to his position and work obligations causing Plaintiff to unnecessarily uproot himself from California to New York, forego lucrative job offers with other companies, lose housing, and suffer economic damages.

17. Plaintiff attained his Bachelor degree in English from University of California, Berkeley in 1998.

18. Plaintiff went on to work for major prominent companies such as Forrester Research, SapientNitro, and currently serves in a leadership role for Wells Fargo. Plaintiff has fifteen (15) years experience solely in the Digital Media and Analytics fields.

19. Plaintiff has been responsible for working on projects of imperative and substantial importance including laying the groundwork and analytics frameworks for companies like Pernod Ricard, Mattel, American Girl, Citi, Bank of Montreal, and others.

20. On or about November of 2011, Plaintiff was hired at Current TV for the position of Director Analytics. Plaintiff responded to a position advertised on their website.

21. The position was in California where Plaintiff resided. Plaintiff's position entailed the following duties: managing entire Digital Analytics and Measurement practice, including all digital video and television shows, providing cross-platform research, and consumer insights via Tableau and Excel dashboards, collaborating on connecting TV audience to Digital behaviors, developing and managing Tableau dashboards for various business units, shows, and stakeholders and managing Google Analytics, Twitter, Facebook Insights, Brightcove, SocialFlow, and several other data sources and accounts to extract actionable insights for all shows and stakeholders. Plaintiff did in fact perform said duties and obligations.

22.  Plaintiff also oversaw one million user email-marketing program and CRM strategy, and provided guidance across all digital marketing efforts (PPC, SEO, Social, and Email) to SVP of Digital.

23. Plaintiff was a full time employee of Current TV and was then promoted to Vice Principle when AJMN acquired Current TV on or about January 2013.

24. John Doe's supervisor at that time was John Sollecito ("Sollecito"), who was responsible for providing Plaintiff with work material including coordinating his schedule and supervising and assigning deliverables from the New York City Head Quarters ("NYC HQ").

25. Sollecito was absent in that he did not provide work material to Plaintiff and failed to correspond with Plaintiff regarding work or other related matters. Sollecito traveled to the San Francisco Head Quarters ("SF HQ") of Current TV for the formal announcement of the acquisition.

26. Between the months of January 2013 and May 2013, Sollecito had very infrequent contact with John Doe, leaving Plaintiff unsure and unclear on his job, position, future, and job security or insight into his immediate work future during and after the acquisition.

27. In June 2013, Sollecito met with Plaintiff and offered him the position of Vice President of Digital Research and Media Insights at AJAM. A condition of the offer was that Plaintiff must move from California to New York, although AJAM had offices in California that were open and operating. Plaintiff was told the SF HQ was closing and it was required of all SF HQ employees to relocate to NYC HQ in order to keep their jobs.

28. Plaintiff attempted to negotiate to remain in California while executing his obligations as Vice President of Digital Research and Media Insights. Sollecito refused stating relocation was mandatory.

29. Sollecito then made the offer over the phone and Plaintiff accepted. Sollecito was to send Plaintiff a contract representing the offer inclusive of term, salary, title and obligations.

30. Sollecito assured Plaintiff on several occasions the contract was on its way but that he did not have time to prepare it.

31. On or about August of 2013 Plaintiff accepted the offer.  Plaintiff did not renew the lease on his apartment he lived in for 10 years previous thereto.  Plaintiff then packed up all of his belongings in his apartment and drove to New York.  Plaintiff arrived on August 19, 2013 the day before AJAM was set to launch.

32. AJMN provided Plaintiff with corporate housing and  Plaintiff signed a residential lease for one year.

33. During this time in 2013, the Chief Executive Officer of AJAM was Ehab Al Shihabi ("Al Shihabi").

34. Al Shihabi approved John Doe's hire and, upon meeting with John Doe, Al Shihabi informed him that he did not in fact have to move to New York.

35.  Plaintiff was further subject to fear tactics such as threats of him being replaced.

36. On or about December 2013 Plaintiff was working on an imperative and fundamental project: designing and developing dashboards using a vendor named Origami Logic and  Plaintiff was abruptly told to cease work on said project.

37. John Doe's ability to perform his work obligations was continuously interfered by AJAM, its agents, employees and representatives.  Plaintiff was pulled into other assignments from executives, and Al Shihabi's constant requests for additional projects, which stalled the Origami Logic assignment.

38. Despite this, Plaintiff completed the Origami Logic dashboard build out and Sollecito threatened Plaintiff to not unveil the project to Al Shihabi so that Sollecito would.

39. On multiple occasions Plaintiff contacted AJAM's HR department for clarification and guidance as to his role and obligations with AJAM. Plaintiff also requested an employment contract to detail his position and obligations.

40. AJAM's HR department in New York failed to respond to his inquiries and outright ignored John Doe.

41. Plaintiff resorted to AJAM's HR department in San Francisco and worked with Dawn Dunlop to provide clarification and guidance.

42. Plaintiff tried to negotiate returning to San Francisco and work as he had done while at Current TV. John Doe's salary with AJAM was lower than the salary he earned with Current TV.

43. It was clear to Plaintiff that his salary and the 40% increase in cost of living he incurred were insufficient to sustain living in New York City long-term.

44. On or about December 5, 2013, Sollecito was forced to respond to Plaintiff and agreed to Plaintiff relocating to California to work in the San Francisco office of AJAM.

45. Plaintiff began preparing for his move back home in that he ended his corporate lease and packed up his apartment in New York.

46. On or about January 3, 2014, Sollecito informed Plaintiff it could take weeks or months for Al Shihabi to approve John Doe's request to relocate.

47. AJAM's standard relocation package was $5,000 after taxes for employees, yet AJAM only offered Plaintiff $2,500 to relocate. Plaintiff was not given direction and was essentially ignored by Defendants.

48. As a result of the harassment, interference with his work, lack of direction and surmounting financial expense, Plaintiff was forced to resign from his position with AJMN in April of 2014.

49. In May of 2014 a lunch meeting was scheduled at a restaurant between Plaintiff and Al Shihabi to discuss John Doe's return to AJAM.

50. Minutes before the meeting Plaintiff was told to come to the office in New York instead where Al Shihabi was present with David Harleston ("Harleston") who misrepresented himself as AJAM's legal counsel and Diana Lee, Vice President of Human Resources. During said meeting Harleston informed Plaintiff a position was not available for him.

51. Plaintiff returned to California sometime in January of 2015. Luai Bashir ("Bashir"), the director of Project Management Operations ("PMO") contacted Plaintiff with another job offer.

52. Bashir was an agent of Defendants and was authorized to bind Defendants AJAM and AJMN to an employment contract with Plaintiff through December 2015.

53. Bashir offered Plaintiff the position of Business Intelligence Consultant to work on the Business Intelligence ("BI") that was mandated and chartered by Al Shihabi.

54. The terms of the agreement included a ninety (90) day consulting arrangement that would then lead to a full time employment role in New York. The agreement was 90-days then a full time offer of a Vice President of Business Intelligence.

55. Bashir pressured Plaintiff by adding that if Plaintiff accepted the offer he would have to be back in New York the next day, on his own expense, to head the department meeting with the BI team.

56. Plaintiff communicated his fear of instability with AJAM and incurring further moving expenses. Bashir assured Plaintiff his employment was secure and that it would develop into long-term employment.

57. Plaintiff informed Bashir he had other responsibilities including his dog. Bashir told Plaintiff to "kill his dog" and "throw him off the Golden Gate Bridge." because AJAM's need was so dire and John Doe's immediate acceptance was imperative.

58. Bashir then offered to house Plaintiff in his apartment so that Plaintiff could get right to work and could look for long term housing at a later time.

59. In reliance on Bashir's statements and offer, Plaintiff booked his flight and arrived in New York on January 15, 2015.

60. Bashir insisted Plaintiff live with him from January to February 2015 in order to not delay the kick off of the BI project and Plaintiff did live with Bashir during said time.

61. Plaintiff then contacted Bashir and asked if he informed others that Plaintiff was hired. Bashir informed Plaintiff "not to worry" and that he did not have to and that he could hire and fire whom he pleases.

62. Plaintiff requested a place to sit to do work as opposed to using the conference room. Bashir failed to provide Plaintiff with proper workspace.

63. Plaintiff was subject to a hostile work environment in that Al Shihabi's executive assistant (Deidre), Harleston, and Bashir's own manager would follow and snicker and gossip about John Doe.

64. Bashir repeatedly stated that Harleston referred to Plaintiff as "an awful person" and Bashir would mock Plaintiff mimicking Harleston's voice and mannerisms.

65. Harleston, an African American male, made it known to Plaintiff that he did not like him because he is Caucasian.

66. On January 16th, Plaintiff went to the MCP (AJAM's midtown headquarters) in Midtown Manhattan to begin work. While working in a conference room, Harleston confronted Plaintiff in a hostile and aggressive manner. Harleston berated Plaintiff for being in the office and asked him "what are you doing here". Plaintiff informed Harleston that he was hired to work and that he was in fact working. Harleston scoffed and stormed out of the conference room.

67. When Plaintiff Bashir about his encounter with Harleston, Bashir told Plaintiff to steer clear of Harleston because he did not like "White people".

68. Bashir ignored John Doe's complaints and the hostility against Plaintiff continued.

69. As a result, Plaintiff began interviewing with other companies including: Conde Nast and Horizon Media.

70. On or about February 12, 2015, Plaintiff received an offer from Horizon Media. Plaintiff then informed Bashir of the offer and his intent to resign from AJAM and AJMN.

71. Bashir pled with Plaintiff to remain with AJAM and affirmed that if Plaintiff stayed, Bashir would give Plaintiff a full time contract to sign immediately.

72. In reliance on Bashir's representations, Plaintiff declined the offer with Horizon Media.

73. The hostile environment continued and although Plaintiff complained, Bashir failed to rectify the aggressive and hostile environment against Plaintiff.

74. As a result, Plaintiff was constructively discharged in that he was forced to resign from the New York office.

75. On February 15, 2015, Plaintiff returned to California. Bashir contacted Plaintiff and asked that he continue to consult for AJAM while in California so that Bashir could offer Plaintiff full time employment.

76. Plaintiff agreed to remain a consultant with AJAM and on March 4th, Bashir and Al Shihabi approved John Doe's employment to December 31, 2015.

77. On or about May of 2015, HJ Chang ("Chang"), the Vice President of Human Resources, called Plaintiff and extended to him an offer of full time employment.

78. When Plaintiff contacted Chang to accept the offer she represented that, due to AL Shihabi's dismissal, all job offers were on hold for approval by a new CEO or secondary authority.

79. Plaintiff was assured both in writing via email between Bashir and Al Shihabi and verbally by Bashir on several occasions that his employment was secure and his contract was going to be honored through the end of the year at minimum.

80. Kate O'Brian ("O'Brian"), President of AJAM, also reiterated this in person when she met with Plaintiff in June 2015.

81. Bashir assured Plaintiff that his job offer was approved and requested that Plaintiff return to New York immediately.

82. On July 15, 2015, Plaintiff again began his drive from California to New York in reliance on Bashir's representations. While in Utah, Bashir called Plaintiff with an "urgent assignment". Bashir directed Plaintiff to "stay put in a hotel" in Utah and finish the assignment for O'Brian.

83. For two days, Bashir directed Plaintiff not to drive anywhere and continued to give Plaintiff assignments.

84. Bashir directed Plaintiff to wait until he can provide more clarity. Plaintiff waited an additional two days in Utah before finally receiving a call from Bashir.

85. On the fourth day, Bashir called Plaintiff to dissuade him from accepting full time employment with AJAM and moving to New York. Thereafter Plaintiff made his way back to California.

86. Upon his return thereto, Plaintiff contacted Sollecito seeking clarity and to complain about the tumultuous job offer and circumstances of employment with AJAM and AJMN as well as the hostile and aggressive work environment of the New York office. Sollecito failed to investigate Plaintiff's complaints.

87. In August of 2015, Plaintiff met with O'Brian to discuss the continued alterations of the terms of his employment and the hostile work environment.

88. O'Brian assured Plaintiff that the new CEO, Anstey would honor the full time employment offer as soon as possible and that she would look into the hostile work environment claims.

89. During the time Plaintiff waited to hear from O'Brian, Plaintiff continued to build out the BI tool and proof of concept.

90. On or about September 1, 2015, Bashir received job approval and approval of the BI from O'Brian and she informed Plaintiff that he can now move to New York to begin his full time employment with AJAM and AJMN.

91. Bashir further represented that he was given his official 2015 business objectives and was given the "green light" to proceed with the BI program in earnest – meaning Plaintiff's job was extended indefinitely into 2016.

92. On or about September 2015, an employee requested approval of pay for hours worked. ICS demanded that Plaintiff approve said employee's hours, as he was her manager. However, AJAM required Bashir to approve the employee's hours. ICS did not even realize that Bashir was the employee's manager not Plaintiff. For several days the conflict ensued until Plaintiff was able to clarify and rectify the matter.

93. On September 7, 2015, Bashir issued an official charter or kick off of the department that included Bashir, Plaintiff, and another employee.

94. Plaintiff made several complaints of the aforementioned acts to Kevin Hyatt ("Hyatt") of ICS prior to September 2015. Hyatt ignored Plaintiff's complaints and failed to perform any investigation into Plaintiff's claims.

95. Instead, HJ Chang contacted Plaintiff to inform him that his contract was ending on September 11, 2015. Plaintiff asked for clarity and Chang refused to provide an explanation and ended the call with Plaintiff.

96. Plaintiff reached out to Hyatt to understand what was happening and Hyatt told Plaintiff he was fired.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Breach of Contract against AJMN and AJAM**

97. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

98. Defendants AJMN, AJAM and ICS, by and through its authorized employee, Defendants, entered into oral and written agreements with the Plaintiff for the purpose of maintaining Plaintiff's employment with Defendants AJMN and AJAM.

99. In furtherance of Plaintiff's employee obligations, Defendants required Plaintiff to move from California to New York, sell personal belongings, terminate a long term lease and incur moving expenses.

100. In furtherance of Plaintiff's employee obligations Plaintiff diligently performed each and every obligation imposed on him under the aforesaid agreements and policies including stopping in Utah at the demand of Bashir, in the middle of his cross-country drive to New York, to complete "emergency work".  Plaintiff's performance was excellent and without blemish.

101. Defendants, without warning, justification or excuse breached the aforesaid agreements by, inter alia, interfering with Plaintiff's ability to perform his work, interfering with Plaintiff's ability to complete his work, failing to compensate Plaintiff for work completed and ultimately terminating Plaintiff.

102. As a direct and proximate result of Defendants AJMN and AJAM breach of contract both express and implied as aforesaid, Plaintiff suffered damages including lost wages.

103. As a result, Plaintiff demands judgment against Defendants AJMN and AJAM for compensatory damages in an amount to be determined at trial, but, in no event, less

than one hundred thousand ($100,000) dollars together with interest, costs, and such other and further relief as the Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
### Breach of the Duty of Good Faith and Fair Dealing

104. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

105. Under New York law, implicit in every contract is a covenant of good faith and fair dealing pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. There is, thus, such an implied covenant in the employment agreement and related documents.

106. The aforementioned agreements constitute valid and enforceable contracts between Plaintiff and Defendants under New York law.

107. Plaintiff has performed, tendered performance of, and/or is excused from performing his contractual obligations under the oral and written agreements.

108. Defendants have breached this implied covenant through its interference with Plaintiff's ability to perform the terms of his contracts with Defendants and in terminating Plaintiff.

109. Plaintiff has been injured as a result of Defendants' breach of the implied duty of good faith and fair dealing.

110. As a result, Plaintiff demands judgment against Defendants AJMN, AJAM and ICS for compensatory damages in an amount to be determined at trial, but, in no event, less than one hundred thousand ($100,000) dollars together with interest, costs, and such other and further relief as the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT

111. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

112. Defendants, without privilege, excuse or justification, intentionally interfered with Plaintiff's contract with other employers by, *inter alia,* persuading Plaintiff to decline offers or not apply in exchange for employment with Defendants AJMN and AJAM.

113. As a result, Plaintiff demands judgment against Defendants AJMN, AJAM and ICS for compensatory damages in an amount to be determined at trial, but, in no event, less than one hundred thousand ($100,000) dollars together with interest, costs, and such other and further relief as the Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
### PRIMA FACIE TORT

114. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

115. Defendants, through their actions set forth in the foregoing paragraphs, intentionally inflicted harm on Plaintiff.

116. Defendants' sole motivation for their acts was a malicious intent to injure Plaintiff.

117. Defendants acted without excuse or justification.

118. As a result of Defendants' acts, Plaintiff has suffered special damages, including the loss of his position at AJMN and AJAM and the income derived and to be derived therefrom.

119. As a result, and based upon the foregoing, Defendants have engaged in a prima facie tort for which Plaintiff is entitled to judgment against Defendants, jointly and severally, in an amount to be determined at trial of this matter but believed to be not less than one hundred thousand ($100,000) dollars plus an additional interest from September 2015, as well as the costs and expenses of this proceeding.

### AS AND FOR A FIFTH CAUSE OF ACTION
### WRONGFUL TERMINATION

120. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

121. Defendants AJMN, AJAM and ICS's termination of Plaintiff was wrongful.

122. As a result of his complaint and in demanding the terms of his employment offer be met, Plaintiff was fired.

123. As a result, Plaintiff has lost wages, pension benefits and interest from September 2015, as well as the costs and expenses of this proceeding,

124. As a result, Plaintiff is entitled to punitive damages in the amount of one hundred thousand ($100,000) dollars plus interest from September 2015, as well as the costs and expenses of this proceeding.

### AS AND FOR A SIXTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMMOTIONAL DISTRESS

125. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

126. Defendants' conduct was extreme and outrageous in that Bashir, as an agent with authority to bind and act on behalf of AJMN and AJAM along with ICS required

Plaintiff to drive cross-country on more than one occasions in reliance and acceptance of the job offer.

127. Defendants' conduct was extreme and outrageous in that Bashir, as an agent with authority to bind and act on behalf of AJMN and AJAM along with ICS offered Plaintiff full time employment orally and in writing via email and required Plaintiff to move out of his home in California to work in New York.

128. Defendants' conduct was extreme and outrageous in that Bashir, as an agent with authority to bind and act on behalf of AJMN and AJAM along with ICS required Plaintiff to drive cross-country on more than one occasions in reliance and acceptance of the job offer.

129. Defendants' conduct transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society in that Plaintiff was forced to relocate his entire life, spend several days in limbo in Utah, sell his belongings, terminate a long term lease and incur monetary expenses to move to New York just so Defendants terminate him months later.

130. Bashir's conduct further transcends the bounds of decency so as to be regarded as atrocious and intolerable in that he demanded Plaintiff kill his own dog as a sacrifice for accepting the job then demanding Plaintiff drive him to solicit a prostitute.

131. As a result, Plaintiff demands judgment against Defendants AJMN, AJAM and ICS for compensatory damages in an amount to be determined at trial, but, in no event, less than one hundred thousand ($100,000) dollars together with interest, costs, and such other and further relief as the Court deems just and proper.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMMOTIONAL DISTRESS

132. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

133. Defendants' conduct of inducing Plaintiff to move to New York twice for a full time position with AJAM and AJMN which entailed a great deal of personal sacrifice is conduct that unreasonably endangered Plaintiff's physical safety and caused Plaintiff great damage.

134. Defendants' conduct of interfering with Plaintiff's ability to perform his work, and terminating Plaintiff also caused Plaintiff great damage.

135. As a result, Plaintiff demands judgment against Defendants AJMN, AJAM and ICS for compensatory damages in an amount to be determined at trial, but, in no event, less than one hundred thousand ($100,000) dollars together with interest, costs, and such other and further relief as the Court deems just and proper.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### PROMISSORY ESTOPPEL

136. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

137. Defendants promised Plaintiff among other things, employment, pay and seniority in projects on multiple occasions.

138. Plaintiff relied upon Defendants promise in that he declined employment offers and/or interviews with other companies, moved from California to New York on two occasions and gave up a salaried job.

139. Plaintiff relied upon Defendants' promise to his detriment. As a direct and proximate result of Defendants' actions, Plaintiff has been damaged.

140. As a result, Plaintiff demands judgment against Defendants AJMN, AJAM and ICS for compensatory damages in an amount to be determined at trial, but, in no event, less than one hundred thousand ($100,000) dollars together with interest, costs, and such other and further relief as the Court deems just and proper.

**WHEREFORE,** Plaintiff respectfully requests that the Court issue a judgment, punitive damages, together with the attorneys' fees, interest, costs and disbursements of this action and

- A. On the first cause of action compensatory and punitive damages in an amount to be determined at trial but no less than $100,000.00; and
- B. On the second cause of action compensatory and punitive damages in an amount to be determined at trial but no less than $100,000.00;
- C. On the third cause of action compensatory and punitive damages in an amount to be determined at trial but no less than $100,000.00;
- D. On the fourth cause of action compensatory and punitive damages in an amount to be determined at trial but no less than $100,000.00;
- E. On the fifth cause of action compensatory and punitive damages in an amount to be determined at trial but no less than $100,000.00 and
- F. On the sixth cause of action compensatory and punitive damages in an amount to be determined at trial but no less than $100,000.00.
- G. On the seventh cause of action compensatory and punitive damages in an amount to be determined at trial but no less than $100,000.00.
- H. On the eighth cause of action compensatory and punitive damages in an

amount to be determined at trial but no less than $100,000.00.

I. Any other and further relief the Court deems just and proper.

Dated: New York, New York
August 12, 2016

                                       Respectfully submitted,

                                       _____/s/_____
                                       By: Tahanie A. Aboushi, Esq.
                                       The Aboushi Law Firm, PLLC.
                                       Attorney for Plaintiff
                                       1441 Broadway, Suite 5036
                                       New York, NY 10018
                                       Telephone: (212) 391-8500
                                       Facsimile: (212) 391-8508