UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

EVAN ANDREWS,

                Plaintiff,

  -v-

AL JAZEERA AMERICA, *et al.*,

                Defendants.

No. 16-cv-6414 (RJS)
ORDER

---

RICHARD J. SULLIVAN, District Judge:

Plaintiff Evan Andrews brings this action against Al Jazeera America ("AJAM"), Al Jazeera Media Network ("AJMN"), and Infinity Consulting Solutions ("ICS"), alleging several causes of action arising out of his employment with AJAM from approximately June 2013 through September 2015. Now before the Court is Defendant AJMN's motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (Doc. No. 48.) For the reasons that follow, AJMN's motion is granted.

I. BACKGROUND

A. Facts[1]

AJMN is a Qatari corporation headquartered in Doha, Qatar; AJAM is a corporation with its principal place of business in New York; and ICS is a "foreign corporation authorized to do business in New York" with its principal place of business in New York. (SAC ¶¶ 5–8.) Plaintiff alleges that he was hired "through" ICS (*id.* ¶ 4) and that he worked for Current TV when it was

---

[1] The following facts are taken from the Second Amended Complaint (Doc. No. 45 ("SAC")), which the Court assumes to be true for the purposes of this motion. In deciding AJMN's motion to dismiss for lack of personal jurisdiction, the Court has also considered AJMN's memorandum of law in support of its motion (Doc. No. 49), Plaintiff's memorandum in opposition (Doc. No. 52 ("Opp'n")) and supporting affidavits submitted by Plaintiff (Doc. Nos. 53, 54 ("Andrews Decl.")), and AJMN's reply memorandum (Doc. No. 55 ("Reply")).

acquired by AJMN in January 2013 and became AJAM (*id.* ¶ 33). After the acquisition, Plaintiff was unsure about his employment status with Current TV/AJAM, now AJMN's wholly-owned American subsidiary, but in June 2013, Plaintiff received a verbal offer from his supervisor at Current TV, John Sollecito, for a job with AJAM on the condition that he relocate from California to work in AJAM's New York office. (*Id.* ¶ 37.) Plaintiff moved to New York and met with AJAM's Chief Executive Officer ("CEO"), Ehab Al Shihabi, who approved his hire. (*Id.* ¶ 43–44.) After experiencing an unstable and at times unpleasant work environment, Plaintiff approached AJAM's human resources departments in New York and San Francisco to discuss returning to California to work in AJAM's San Francisco office. (*Id.* ¶¶ 45, 47, 49–52.) On December 5, 2013, Sollecito approved his transfer. (*Id.* ¶ 54.) However, on January 3, 2014, Sollecito reversed course and told Plaintiff that it could take months for Al Shihabi to approve his relocation; at some point, Plaintiff also learned that he would only receive half of AJAM's standard $5,000 relocation package. (*Id.* ¶¶ 56–57.) In April 2014, Plaintiff resigned from AJAM and, after an unsuccessful May 2014 meeting with Al Shihabi to discuss his continued employment with AJAM, returned to California in January 2015. (*Id.* ¶¶ 59–61.)

Plaintiff alleges that soon after returning to California, Luai Bashir, the Director of Project Management Operations at AJAM, offered him a job in the business intelligence unit, which had been established by Al Shihabi himself, again on the condition that he move back to New York. (*Id.* ¶¶ 61–65.) The offer was for a 90-day consulting position, with the expectation that it would lead to full-time employment in the New York office. (*Id.* ¶ 64.) On January 15, 2015, Plaintiff returned to New York and began working at AJAM's New York headquarters the next day. (*Id.* ¶¶ 69, 76.) Plaintiff alleges that he immediately experienced a hostile work environment, began interviewing with other potential employers, and received an offer to work at another media

services company on February 12, 2015.  (*Id.* ¶¶ 76–80.)  Plaintiff communicated his intent to resign from AJAM, but decided to decline his other offer after Bashir told him that, if he stayed with AJAM, he would receive a contract for full-time employment.  (*Id.* ¶ 81.)  Plaintiff continued to work for AJAM in New York, but the hostile work environment allegedly continued, prompting Plaintiff to once again quit and move back to California on February 15, 2015.  (*Id.* ¶¶ 84–85.)

After returning to California for the second time, Plaintiff again received an offer to consult for AJAM as a means of obtaining full-time employment, and was assured by Al Shihabi and Kate O'Brian, AJAM's President, that he would be employed through 2015.  (*Id.* ¶¶ 85–86, 89–90.)  In July 2015, Plaintiff again left California to work in AJAM's New York office, but stopped in Utah to work on an undisclosed "urgent assignment" for several days.  (*Id.* ¶¶ 92–95.)  However, two days later, while Plaintiff was still in Utah, Bashir contacted Plaintiff to discourage him from accepting AJAM's latest offer, prompting Plaintiff to return to California.  (*Id.* ¶ 95.)  Plaintiff then discussed his employment situation with O'Brian, who assured him that AJAM's new CEO would honor its commitment to employ him and investigate his allegations of a hostile work environment.  (*Id.* ¶¶ 97–98.)  O'Brian approved Plaintiff's job offer on September 1, 2015 (*id.* ¶ 100), but soon thereafter, Plaintiff was told that his contract would end on September 11, 2015, and that he was fired (*id.* ¶ 105–106).

## B.  Procedural History

Plaintiff initiated this action on August 12, 2016 under a fictitious name (Doc. No. 5), and filed an amended complaint on August 26, 2016, replacing the John Doe pseudonym with Plaintiff's real name, Evan Andrews (Doc. No. 10).  Plaintiff amended his complaint again on November 9, 2016, asserting claims against all three corporate Defendants for breach of contract, breach of the duty of good faith and fair dealing, wrongful termination, tortious interference with

contract, prima facie tort, promissory estoppel, intentional infliction of emotional distress, and negligent infliction of emotional distress.  (Doc. No. 45 ¶¶ 107–150.)  On November 23, 2016, AJMN filed the instant motion to dismiss for lack of personal jurisdiction (Doc. No. 48), which was fully briefed on December 13, 2016 (Doc. No. 55).

## II.  LEGAL STANDARD

"The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss."  *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  "[W]here a court rules on a 12(b)(2) motion based on pleadings and affidavits, the plaintiff is only required to make a prima facie showing of jurisdiction over the defendant."  *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 440 (S.D.N.Y. 2008); *see also Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).  Moreover, "[f]or the purpose of resolving a 12(b)(2) motion, a district court must construe the pleadings and affidavits in the light most favorable to the plaintiff."  *Dean St. Capital Advisors, LLC v. Otoka Energy Corp.*, No. 15-cv-824 (RJS), 2016 WL 413124, at *2 (S.D.N.Y. Feb. 1, 2016) (citing *Chloe*, 616 F.3d at 163).  A court may also consider materials outside the pleadings.  *See Whitaker*, 261 F.3d at 208.  Thus, the Court "assumes the truth of the plaintiff's factual allegations for purposes of the motion," *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt*, S.A., 902 F.2d 194, 197 (2d Cir. 1990)), and evaluates "whether [the plaintiff] ha[s], through its pleadings and affidavits, made a prima facie showing of personal jurisdiction 'notwithstanding any controverting presentation by' [the defendant]," *id.* at 86 (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).  Nevertheless, the Court may not "draw 'argumentative inferences' in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (quoting *Atlantic Mut.*

*Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)), nor is it "bound to accept as true a legal conclusion couched as a factual allegation," *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).

A federal district court sitting in diversity may exercise personal jurisdiction over the parties to the same extent as a state court of general jurisdiction in the state in which the federal court sits. Fed. R. Civ. P. 4(k)(1)(A); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002). Accordingly, in diversity actions, federal courts in New York use a two-step process to consider motions made pursuant to Federal Rule of Civil Procedure 12(b)(2). "First, the court must determine if New York law would confer upon its courts the jurisdiction to reach the defendant." *Bank Brussels Lambert*, 305 F.3d at 124. Second, "[i]f there is a statutory basis for jurisdiction, the court must then determine whether New York's extension of jurisdiction in such a case would be permissible under the Due Process Clause of the Fourteenth Amendment." *Id.* The Due Process Clause requires that a party have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945)).

### III.  DISCUSSION

Plaintiff asserts that personal jurisdiction over AJMN, a foreign corporation, is proper pursuant to either Section 301 or Section 302 of New York's long-arm statute. N.Y. C.P.L.R. §§ 301, 302. Section 301 authorizes general jurisdiction over a non-domiciliary defendant "if the defendant is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction." *Thackurdeen v. Duke Univ.*, 130 F. Supp. 3d 792, 798–99 (S.D.N.Y. 2015) (internal quotation marks omitted), *aff'd*, 660 F. Appx. 43 (2d

Cir. 2016).  Section 302 authorizes specific jurisdiction over a non-domiciliary in a number of instances, including a non-domiciliary that "transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1).  The Court will address each of these sections in turn.

### A.  General Jurisdiction

A court may assert general jurisdiction over foreign corporations only "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Only "in an exceptional case," the Supreme Court has explained, will "a corporation's operations in a forum other than its formal place of incorporation or principal place of business . . . be so substantial and of such a nature as to render the corporation at home in that State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 n.19 (2014); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) ("[I]n our view *Daimler* established that, except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business – the 'paradigm' cases.")

Here, Plaintiff does not dispute that AJMN is a Qatari corporation with its principal place of business in Doha, Qatar.  (*See* SAC ¶ 5.)  Rather, Plaintiff contends that AJMN is subject to the Court's general jurisdiction because of its website, which is accessible in New York, and because of the activities of its subsidiary, AJAM.  (Opp'n at 7–8.)  The Court disagrees.

### 1.  AJMN's Website Does Not Establish General Jurisdiction Over AJMN

Plaintiff asserts that AJMN maintains a website accessible to New York citizens on which it "makes no effort . . . to differentiate itself from AJAM," "provides all of its services and products to New York," and hires "personnel for the New York bureau office."  (*Id.* at 6–7.)  In support of

this argument, Plaintiff has attached a screenshot of the AJMN website, which describes AJMN as a "truly global network" and lists AJAM as part of the "Al Jazeera Media Network." (Doc. No. 53, Ex. A.) Plaintiff does not allege that the website was created in New York or hosted on servers in New York. These allegations are far from sufficient to establish general jurisdiction over AJMN: even prior to *Daimler*, it was "well-established that a website accessible to New York residents – even a website with interactive components – is insufficient to support general jurisdiction." *UTC Fire & Sec. Ams. Corp. v. NCS Power, Inc.*, 844 F. Supp. 2d 366, 371 (S.D.N.Y. 2012); *see also Mejia-Haffner v. Killington, Ltd.*, 119 A.D.3d 912, 913 (2d Dep't 2014) (rejecting argument that "a business's interactive website, accessible in New York, subjects it to suit in this State for all purposes"); *Allojet PLC v. Vantgage Assocs.*, No. 04-cv-05223 (SAS), 2005 WL 612848, at *5 (S.D.N.Y. Mar. 15, 2005) ("[A] defendant's use of an interactive website . . . generally will not confer general jurisdiction over a defendant."). Accordingly, AJMN's website is plainly not "so substantial and of such a nature" as to render AJMN at home in New York. *Daimler*, 134 S. Ct. at 761 n.19.

2. The Actions of AJMN's Subsidiary Do Not Establish General Jurisdiction Over AJMN

For New York courts to exercise general jurisdiction over a parent corporation by dint of the actions of its subsidiary, the subsidiary must be either an "agent" or a "mere department" of the foreign parent. *See Koehler v. Bank of Berm. Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996). "The agency rule generally looks to the relative importance and extensiveness of the work being done by the local corporation for the foreign corporation. The mere department rule, on the other hand, looks more specifically at the two corporations['] treatment of one another in order to discern whether corporate separation is real or only formal." *Mayatextil, S.A. v. Liztex U.S.A., Inc.*, No. 92-cv-4528 (SS), 1995 WL 131774, at *4 (S.D.N.Y. Mar. 23, 1995) (Sotomayor, J.) (internal

7

citation omitted).  In light of the Supreme Court's decision in *Daimler*, the Second Circuit recently conveyed skepticism as to the viability of the agency rule, but indicated that the mere department theory of jurisdiction is still valid.  *See Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (per curiam) (reversing district court's denial of motion to dismiss for lack of personal jurisdiction and noting that "*Daimler* expressed doubts as to the usefulness of an agency analysis . . . that focuses on a forum-state affiliate's importance to the defendant rather than on whether the affiliate is so dominated by the defendant as to be its alter ego").  Accordingly, the Court will address the mere department rule before turning to the agency rule and the Due Process Clause.

a.  AJAM Is Not a "Mere Department" of AJMN

When determining whether a subsidiary is a "mere department" of the parent, courts consider four factors:  (1) "common ownership"; (2) "financial dependency of the subsidiary on the parent corporation"; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent."  *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120, 121, 122 (2d Cir. 1984).  While "[e]ach of the [*Beech Aircraft*] factors need not weigh entirely in plaintiffs' favor," the first factor, common ownership, is "essential," "[t]he other three factor are important," and courts balance all four.  *Advance Coating Tech., Inc. v. LEP Chem. Ltd.*, 142 F.R.D. 91, 95 (S.D.N.Y. 1992).

Most of Plaintiff's jurisdictional allegations throughout the Second Amended Complaint are conclusory, ambiguous, and/or contradicted by other, more specific allegations.  For example, Plaintiff flatly asserts that "AJAM does not gather or disseminate news for any other clients,

independent contractors or entities except for AJMN" (SAC ¶ 17) and that "AJMN provides all of its services to New York via AJAM including news information, social media access and subscription options" (*id.* ¶ 22), without providing any further detail as to the nature or extent of AJAM's provision of services to AJMN, or vice versa. *See Jazini*, 148 F.3d at 184 (allegations with "no facts supporting [the] conclusion" are insufficient to "constitute a prima facie showing of" personal jurisdiction under the agency and mere department rules). Plaintiff similarly asserts that "AJAM does not have independent financial resources from AJMN and could not sustain its operations but for material assistance from AJMN" (SAC ¶ 23) and that "AJAM was not adequately capitalized and upon the decision of AJMN was directed to cease operations and essentially 'shut down'" (*id.* ¶ 24), again without explaining the bases for any of these claims. Plaintiff's penchant for unsourced and conclusory allegations continues in the affidavit attached to his opposition brief, in which he asserts that "AJMN did not treat AJAM as a separate business entity" (Doc. No. 54 ("Andrews Decl.") ¶ 8), that "AJMN ordered AJAM to be shut down in part because AJMN could no longer afford to fund AJAM" (*id.* ¶ 19), and that "AJAM's financial affairs were not separate and apart from the financial affairs of AJMN" (*id.* ¶ 21). In addition to being conclusory, most of these allegations "are but a restatement of . . . the factors to be considered under the standards set forth in *Beech Aircraft*" and "lack the factual specificity necessary to confer jurisdiction." *Jazini*, 148 F.3d at 185. But even if accepted at face value, these assertions fail to establish that AJAM was a mere department of AJMN under the *Beech Aircraft* factors.

With regard to the first and second *Beech Aircraft* factors, common ownership and financial dependency, the Second Amended Complaint alleges, and AJMN does not dispute, that AJAM and AJMN have common ownership and that AJMN funded AJAM's operations. (*See* SAC ¶¶ 16, 23; Reply at 7). Accordingly, the first and second factors are satisfied.

9

As for the third *Beech Aircraft* factor – which turns on the degree of the parent company's interference in the selection and assignment of executive personnel and its failure to observe corporate formalities – Plaintiff alleges that he was "privy" to conversations where "AJAM's budget, direction and content were determined by AJMN" (Andrews Decl. ¶ 14), that he "took direct orders" regarding AJAM content from AJMN's CEO (*id.*), that "AJAM's financial affairs were not separate and apart from the financial affairs of AJMN" (*id.* ¶ 21), that AJAM "did not hold any corporate meetings . . . and did not hire employees or pay salaries to employees" (*id.* ¶ 22), that "AJMN ordered AJAM to be shut down" (*id.* ¶19), and that "AJMN receives employment applications, conducts interviews and makes the decision for the hire of persons interested in working at AJAM" (SAC ¶ 18).  Plaintiff provides no detail regarding the identities or roles of participants of the conversations he was privy to, the nature or extent of AJMN's alleged control over AJAM's direction, content, and financial affairs, or how executive personnel were selected and assigned.  Plaintiff's allegations are also squarely contradicted by the other, more specific allegations in the Second Amended Complaint regarding Plaintiff's own employment applications and negotiations with ICS and AJAM's CEO, President, human resources department, and employees.  For example, Plaintiff alleges that he was hired "through ICS," and that AJAM's CEO, Ehab Al Shihabi, approved his hiring, made decisions regarding whether Plaintiff needed to relocate, gave him assignments, offered him employment after he quit, revoked the offer of employment, and established a business intelligence unit within AJAM.  (*Id.* ¶¶ 4, 43–47, 59–60, 63.)  Plaintiff also alleges that one of AJAM's several job offers was put on hold until a new CEO could be approved but that AJAM's President assured him that the offer was secure and later formally approved the offer.  (*Id.* ¶¶ 87–90, 97–98, 100.)  By contrast, Plaintiff has not alleged any facts regarding AJMN's role in that process, much less that typical corporate formalities were

disregarded.  All in all, Plaintiff offers more and better allegations regarding AJAM's corporate *autonomy* than he does for its allegedly dependent status.

As to the fourth *Beech Aircraft* factor – the degree of control over the marketing and operational policies of the subsidiary exercised by the parent – Plaintiff's allegations regarding AJMN's logo, content, and "religious and cultural values" are completely lacking in factual specificity and, at most, serve only to demonstrate the "normal business influence of a corporate parent."  *Giar v. Centea*, No. 02-cv-7916 (LLS), 2003 WL 1900836, at *1 (S.D.N.Y. Apr. 16, 2003), *aff'd*, 86 F. App'x 461 (2d Cir. 2004) (allegations that subsidiary was 99.6% owned by parent, shared some directors, and followed parent's policies were insufficient to demonstrate that subsidiary was a mere department of parent); *see also In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 403, 411 (S.D.N.Y. 2002) ("unified presentation," "use [of] the same corporate logo," and "hold[ing] themselves out to the world as a single entity" are "insufficient to show 'pervasive' or 'complete' control, or that the distinction between the companies is more formal than real").  Similarly, AJMN's website, which reflects some uniformity within the Al Jazeera network, is hardly evidence that "AJAM is controlled by AJMN."  (Opp'n at 10); *see J.L.B. Equities v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) ("[T]he Court is not persuaded that failure to distinguish between parent and subsidiary on a webpage is sufficient to show that the parent controls the subsidiary's marketing and operational policies."); *Bellomo v. Pa. Life Co.*, 488 F. Supp. 744, 745 (S.D.N.Y. 1980) (a parent does not subject itself to jurisdiction merely by portraying an affiliate as part of a unitary enterprise).

Indeed, Plaintiff's allegations in the Second Amended Complaint involving the operational aspects of AJAM's business indicate that he consulted with employees and officers of AJAM, not AJMN, and that AJAM employees and officers made all of the relevant decisions.  Beyond his

11

above-described interactions with AJAM's CEO and President, Plaintiff was also in frequent contact with AJAM's human resources departments in New York and in San Francisco, including Dawn Dunlop in the San Francisco office and HJ Chang, the Vice President of Human Resources, to clarify his role and obligations at AJAM, to coordinate an ultimately unsuccessful transfer to California, and to negotiate his potential return after he resigned.  (SAC ¶¶ 49–57, 60.)  Plaintiff alleges that he worked out of AJAM's New York headquarters before resigning for a second time, that he consulted for AJAM after moving to California, and that AJAM's CEO mandated and established a business intelligence unit within AJAM's New York office.  (*Id.* ¶ 63, 76, 85–86.) The Second Amended Complaint hardly mentions AJMN at all.

After balancing the *Beech Aircraft* factors, the Court finds that Plaintiff has failed to allege that AJAM is a mere department of AJMN or that AJMN's "control over [AJAM] is pervasive enough that the corporate separation is more formal than real."  *Gallelli v. Crown Imports*, LLC, 701 F. Supp. 2d 263, 272 (E.D.N.Y. 2010).  Accordingly, Plaintiff has failed to show that AJAM is a mere department of AJMN.

### b.  AJAM Is Not an "Agent" of AJMN

To establish that a subsidiary is an "agent" of the parent, the plaintiff must show that the subsidiary "does all the business which [the parent corporation] could do were it here by its own officials."  *Jazini*, 148 F.3d at 184 (quoting *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 537 (1967)).  The Second Circuit has interpreted this standard to require that the subsidiary provide services to the parent that "are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services."  *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir. 1967); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 96 (2d Cir. 2000) (investor

relations office was an agent because it "devoted one hundred percent of [its] time to the [parent's] business" and its "sole business function was to perform investor relations services" on the parent's behalf"); *Frummer*, 19 N.Y.2d at 537 (foreign hotel's subsidiary reservation service, which did public relations work and booked hotel rooms for parent corporation, was an agent when "the very purpose for which [the reservation service] was established" was to generate business for parent).

Plaintiff argues that "AJAM was operated and maintained as an office and bureau of AJMN," and that "all of the Al Jazeera bureaus . . . shared resources but each required approval for content, budget and hiring from AJMN and had no autonomy." (Andrews Decl. ¶ 10.) In support of this allegation, Plaintiff attaches screenshots of AJMN's website, which states that "[e]ach subsidiary in the Al Jazeera Media Network follows the same principles and values that inspire it," and argues that these allegations are sufficient to show that "AJAM does not have autonomy to choose content[,] rather, its content is dictated by AJMN to ensure adherence to its religious and cultural values." (Opp'n at 10.) Plaintiff emphasizes that AJAM uses the same logo as AJMN (*id.*), provides emails indicating that AJAM may have used a camera crew from one of AJMN's European bureaus for a story in Greece (Doc. No. 53-7), and asserts that AJMN "used AJAM to broadcast news for it in New York." (Opp'n at 2.)

These allegations fall short of establishing that AJAM does "all the business which AJMN could do were it here by its own officials" and that its services are so important that, but for AJAM, AJMN would "undertake to perform substantially similar services." Indeed, most of Plaintiff's allegations do not relate to "services performed" by AJAM on behalf of AJMN at all, and are more appropriately considered under the "mere department" standard. To the extent Plaintiff's allegation that AJAM broadcasted news for AJMN in New York involves "services performed," Plaintiff does not explain what broadcasting news "for" AJMN entails, nor does he allege facts

demonstrating that AJAM devotes anywhere near "one hundred percent" of its efforts to AJMN. *Wiwa*, 226 F.3d at 96.  What is more, Plaintiff has entirely failed to allege that whatever services AJAM performed on behalf of AJMN were "sufficiently important" to AJMN to justify the exercise of general jurisdiction.  *See Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 569 (S.D.N.Y. 2006), *aff'd*, 277 F. App'x 92 (2d Cir. 2008) (courts "look to the percentage of a company's revenue attributable to New York business in determining whether solicitation is substantial and continuous") (collecting cases).  Accordingly, Plaintiff's allegations do not establish that AJAM was an agent of AJMN.

   3.  The Due Process Clause Does Not Permit the Exercise of General Jurisdiction Over AJMN

        But even if New York's long arm statute could be deemed to confer general jurisdiction over AJMN, the Court would nevertheless find that Plaintiff's allegations do not come close to establishing that AJMN is "at home" in New York as required by the Due Process Clause. Although *Daimler* did "not foreclose the possibility that[,] in an exceptional case," general jurisdiction in a forum other than a corporation's place of incorporation and principal place of business would be appropriate, this is not that case.  *Daimler*, 134 S. Ct. at 761 n.19.  Even assuming that *all* of AJAM's contacts in New York should be imputed to AJMN, "they do not shift the company's primary place of business (or place of incorporation) away from" Qatar, because even "even a company's 'engage[ment] in a substantial, continuous, and systematic course of business' is alone insufficient to render it at home" here.  *Sonera Holding B.V.*, 750 F.3d at 226 (quoting *Daimler*, 134 S.Ct. at 761); *see also SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 168 (S.D.N.Y. 2015) (nonresident corporation not subject to general jurisdiction in New York even though it "has offices in New York, conducts substantial business here, has a registered agent

here," and otherwise engages in a "substantial, continuous, and systematic course of business in New York").

In short, Plaintiff describes a parent corporation with "over 70 bureaus around the world" (Opp'n at 10), and proposes to allow AJMN to be sued in New York for any conduct occurring in any of those seventy cities by dint of its control of AJAM. That outcome is entirely inconsistent with *Daimler*. 134 S.Ct. at 762 n.20 ("A corporation that operates in many places can scarcely be deemed at home in all of them."). The Court thus finds that, even if AJAM could be deemed an agent or mere department of AJMN under Section 301, AJMN's business in New York is not so continuous and systematic as to render it essentially at home here. Accordingly, subjecting AJMN to general jurisdiction in New York would deny it due process of law.

### B.  Specific Jurisdiction

#### 1.  AJMN Is Not Subject to Specific Jurisdiction Under C.P.L.R. Section 302(a)(1)

Plaintiff alternatively asserts that personal jurisdiction is proper pursuant to Section 302(a)(1) of New York's long-arm statute, which authorizes jurisdiction over a non-domiciliary that "transacts any business within the state or contracts anywhere to supply goods or services in the state." (Opp'n at 9–12); N.Y. C.P.L.R. § 302(a)(1). In determining whether a defendant is subject to the exercise of specific jurisdiction by a New York court pursuant to Section 302(a)(1), courts must determine "(1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action arises from such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (internal quotation marks and alterations omitted). The first prong focuses on whether defendant has engaged in "purposeful activity," meaning "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (internal quotation

marks omitted).  The second factor requires that there be an "articulable nexus or substantial relationship between the business transaction and the claim asserted." *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339 (2012)).

Construing the pleadings and Plaintiff's affidavits in the light most favorable to Plaintiff, the Court finds that Plaintiff has not met this standard.  With regard to the first prong of the test – whether Defendant transacts any business in New York – Plaintiff has failed to set forth a single transaction by AJMN that took place in New York.  As for the fact that AJMN's website is accessible in New York, that too is clearly insufficient, by itself, to establish AJMN's business presence in the state.  *See Drucker Cornell v. Assicurazioni Generali S.p.A. Consol.*, No. 97-cv-2262 (MBM), 2000 WL 284222, at *6 (S.D.N.Y. Mar. 16, 2000) ("[T]he mere fact that [defendant] allegedly maintains a website that can be accessed by New York citizens . . . does not establish that the firm 'transacts business' in New York."); *Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*, 10 F. Supp. 2d 334, 340 (S.D.N.Y. 1998) (communications initiated outside New York "do not provide a basis for personal jurisdiction under § 302(a)(1) unless they are used by the defendant to actively participate in business transactions in New York").  But even if the allegation that New Yorkers may submit job applications to work for AJMN through its website were enough to constitute "transacting business in New York," Plaintiff makes no attempt to articulate a nexus between AJMN's website and his claims, nor does he allege that anyone associated with AJMN had any involvement in his employment with AJAM, thus failing the second prong of the test.  Accordingly, Plaintiff has failed to establish specific jurisdiction over AJMN under Section 302(a)(1).

2.  AJMN Is Not Subject to Specific Jurisdiction Under C.P.L.R. Sections 302(a)(2) or (3)

Although Plaintiff does not raise either provision in his opposition, the Second Amended Complaint also fails to make a prima facie case for personal jurisdiction under Sections 302(a)(2) and 302(a)(3) of New York's C.P.L.R.   Section 302(a)(2) authorizes jurisdiction over a non-domiciliary who "commits a tortious act within the state," and Section 302(a)(3) authorizes jurisdiction over a non-domiciliary who commits a tortious act from outside of the state that causes injury to a person or property within the state if the non-domiciliary (1) regularly does or solicits business in the state, or (2) should reasonably expect the tortious act to have consequences in the state and derives substantial revenue from interstate or international commerce.   N.Y. C.P.L.R. § 302.   Both provisions require that a defendant commit a tortious act; however, the tortious employment decisions which form the gravamen of Plaintiff's complaint are all alleged to have been performed by officers and employees of AJAM.   Plaintiff argues in his opposition brief that he was "subject to constant breaches of the terms of his employment and a hostile work environment in the New York office" (Opp'n at 11), and repeatedly asserts that "Defendants" committed tortious acts against him (*see, e.g.*, *id.* at 11–12), presumably in an attempt to associate AJAM and AJMN together.   However, the allegations in the Second Amended Complaint are all specific to AJAM:  Plaintiff alleges that he received job offers from AJAM to work for AJAM (SAC ¶¶ 37, 59, 61, 85–86, 95–96), that he interacted with AJAM's human resources department (*id.* ¶¶ 49–51), that he worked in AJAM's San Francisco and New York offices (*id.* ¶¶ 54, 76), and that the hostile work environment he experienced was created by AJAM officers and employees (*id.* ¶ 73).   To the extent Plaintiff makes allegations involving AJMN, he does so haphazardly and clumsily.   For example, Plaintiff groups AJMN and AJAM together without making any specific, factual allegations regarding AJMN and oftentimes in flagrant contradiction with his other

17

allegations that are specific to AJAM: at one point in the Second Amended Complaint, Plaintiff alleges that he was forced to resign from AJMN (*id.* ¶ 58), despite having previously alleged multiple times that the job he resigned from was with AJAM (*see id.* ¶¶ 37, 47, 49–52). For all these reasons, the Court concludes that Plaintiff has likewise failed to establish specific jurisdiction over AJMN pursuant to C.P.L.R. Sections 302(a)(2) or 302(a)(3).

IV. CONCLUSION

For the reasons set forth above, Defendant AJMN's motion to dismiss for lack of personal jurisdiction is GRANTED.[2] The Clerk of Court is respectfully directed to terminate the motion pending at docket number 48.

IT IS FURTHER ORDERED THAT, by October 13, 2017, the remaining parties in this action shall submit to the Court a proposed case management plan and scheduling order. A template for the order is available at: http://www.nysd.uscourts.gov/judge/Sullivan. The parties shall file the proposed case management plan and shall email a courtesy copy to chambers at: sullivanNYSDchambers@nysd.uscourts.gov.

SO ORDERED.

Dated:  September 30, 2017
        New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

---

[2] Although unnecessary in light of the Court's findings regarding jurisdiction, the Court would also conclude that Plaintiff has failed to state a claim against AJMN, since the Second Amended Complaint alleges virtually no conduct by employees or agents of AJMN and wholly fails to allege that AJMN is the alter ego of AJAM.